IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ROBERT J. ENNIS and ) | Case No. 13-61122 |
| ELIZABETH A. ENNIS, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| ) | |
| KENNETH J. PUGH and ) | |
| LINDA B. PUGH, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adversary No. 13-6044 |
| ) | |
| ROBERT J. ENNIS and ) | |
| ELIZABETH A. ENNIS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Plaintiffs Kenneth J. Pugh and Linda B. Pugh filed this adversary proceeding against Debtor-Defendants Robert J. Ennis and Elizabeth A. Ennis seeking a determination that the Debtors' debt to them for damage to a rental property and for defamation are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). For the reasons announced at the conclusion of the trial, as supplemented by those that follow, judgment will be entered in favor of the Plaintiffs.

At the outset, I would mention that the Debtors' version of events is dramatically different than that of the Pughs. The Debtors wish to cast the Pughs as dishonest slumlords, and Mr. Pugh as a pervert. However, the Debtors' testimony was entirely contradicted by the evidence presented at trial and, simply

put, I found them to be lacking in credibility on nearly every relevant point. Contrary to the Debtors' characterization, I find that the Pughs take pride in the quality and cleanliness of their rental properties and that Elizabeth Ennis' allegations of sexual misconduct by Kenneth Pugh are false.

With that framework in mind, the evidence at trial showed that the Pughs own four rental houses in and around Willow Springs and Cabool, Missouri. They have been in the rental house business for over thirty years.

The Pughs often hire an independent contractor, Kathy Delp, to clean and repair the rental houses between tenants. Ms. Delp testified that, in early 2011, she did rather extensive work on the house located at 502 N. Harris in Willow Springs, the property at issue here.

In early March 2011, after seeing a sign in the window of the house at 502 N. Harris, the Debtors submitted Leasing Applications to rent it. At the time the Debtors submitted their Applications, the Debtors advised the Pughs, both verbally and in their written Applications, that they had one small Chihuahua dog.[1] Despite their normal practice of not allowing pets at all in their rental homes, the Pughs agreed to enter a lease with the Debtors and to allow the one small dog they had represented they had. Accordingly, on March 15, 2011, the Debtors and the Pughs entered into a one-year lease, effective April 1, 2011, which, as relevant here, stated as follows:

> Pets: Lessor agrees to allow one small Chihuahua. Lessee agrees to have no other pets. Lessee agrees to be responsible for any and all damages and costs to repair property damaged by pet.[2]

---

[1] Plaintiffs' Exhibit 2 and 3.

[2] Plaintiffs' Exhibit 1.

Contrary to the Debtors' testimony, I find that the Pughs and the Debtors did a walkthrough of the entire house prior to entering into the lease. Further, directly contrary to Elizabeth Ennis' testimony that the house was a "dump" when they moved in, photographs dated March 29, 2011 showed that the house was in very good and clean condition when the Debtors toured the house.[3] This photographic evidence was corroborated by both Linda Pugh and Kathy Delp, who did the work at the house.

The Debtors stayed in the property for the full one-year lease term, and timely paid the monthly rent. The lease terminated on March 31, 2012.

On April 2, 2012, having not received keys from the Debtors or heard from them regarding whether they wished to stay in the property, the Pughs went to the property and found that the Debtors had gone. They also discovered that the Debtors had left the house with significant damage. Linda Pugh and Kathy Delp both testified as to the condition of the house when the Debtors moved out.

Both women described the condition of the house at that time as "disgusting." There was a significant amount of trash and animal waste all about the house. The wood floors were destroyed by scratches and urine stains; tiles on the floor in the kitchen were broken; the bathtub (which was brand new when the Debtors moved in) was severely damaged and stained; several doors were extremely dirty and damaged; holes had been punched into ceiling tiles; the mini blinds were missing or damaged; and light bulbs were missing.

Contrary to Elizabeth Ennis' testimony that she never had any dog in the house except for her one small dog, Mrs. Pugh and Ms. Delp both testified it was clear to them that many aspects of the damage were caused by one or more large dogs in the house. Indeed, the post-lease photographic evidence admitted at trial

---

[3] Plaintiffs' Exhibit 5.

3

clearly shows there had been large dogs in the house and the Pughs offered into evidence a remarkably-damaged heavy metal doorknob which one can only conclude was chewed up by a large dog.[4] As Ms. Delp testified, it was clear from the condition of urine-stained floors, the damaged doors, and the doorknob, that a large dog or dogs were locked in the house for long periods of time and were trying to get out.

Further, Linda Pugh testified that, in hindsight, it was clear that the Debtors conducted themselves in a manner to prevent the Pughs from discovering the animals inside the house. In particular, the Debtors paid their rent in cash each month. Linda Pugh testified that, typically, when a renter pays cash, the Pughs go to the rental house to collect the rent in person. However, in the Debtors' case, she testified, the Debtors made an effort each month to meet the Pughs somewhere else to pay the rent. Although the Pughs drove by the house on occasion and viewed the exterior of the house, they never saw the interior, in part because of this manner of paying the rent.

The Pughs assert that the damage to the house caused by the misrepresented animals should be nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. That section provides, as relevant here, that a discharge under § 727 does not discharge an individual debtor from any debt "for money, property, [or] services . . . to the extent obtained by . . . false, pretenses, a false representation, or actual fraud."

> In order to prevail under § 523(a)(2)(A) on the basis of actual fraud, a creditor must prove: (1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he

---

[4] Plaintiffs' Exhibits 6 and 19.

4

made the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor was damaged.[5]

I find, based on the evidence, that both of the Debtors represented to the Pughs that they had one small Chihuahua; that that representation was false; that the Debtors knew it was false when they made the representation; that they subjectively intended to deceive the Pughs at the time they made the representation; that the Pughs justifiably relied on the statement; and that the Pughs were damaged as a result of the misrepresentation. As a result, the debt for damage caused by the dogs is nondischargeable as to both of the Debtors pursuant to § 523(a)(2)(A) for actual fraud.

However, as I stated at the trial, the Pughs' damages caused by the fraud are limited to the damage caused by the animals which were misrepresented. Other items, such as repair to the water heater, plumbing, replacing door locks, removal of trash, and loss of rent due to no notice of move, were not caused by the misrepresentation concerning the animals. The damages which are related to the animals, and are thus nondischargeable, include flooring for bedrooms and hall ($520.00); bathtub damage repair ($100.00); painting, repair, cleanup ($567.00); door repair, sanding and repainting ($200.00); tile, supplies, and installation ($578.98); and cost to enforce the lease ($1,000.00). In addition, the Pughs are entitled to some compensation for the time they spent at the house repairing it. Therefore, I find that the Pughs are entitled to judgment for fraud against both Debtors in the amount of $4,500, and that such judgment shall be nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

---

[5] *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 423 B.R. 309, 313-14 (B.A.P. 8th Cir. 2010) (citation and internal quotation marks omitted), rev'd on other grounds, *In re Treadwell*, 637 F.3d 855 (8th Cir. 2011)..

The Pughs also assert that Debtor Elizabeth Ennis made defamatory statements about them and that damages from the defamation should be nondischargeable under § 523(a)(6). That section provides that a discharge under § 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Willful and malicious are two distinct requirements that the Pughs, as the parties seeking to avoid the discharge of the debt, must prove by a preponderance of the evidence.[6] Willfulness is defined as headstrong and knowing conduct, and malicious is defined as conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm.[7] The Debtors must have acted with the intent to harm the Pughs rather than merely acting intentionally in a way that resulted in harm.[8]

With regard to defamation under Missouri law:

> In order to prove defamation, a plaintiff must prove: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation. Proof of actual harm to the plaintiff's reputation is an absolute prerequisite in a defamation action. The evidence proffered to establish actual damages may not be too speculative and must be founded upon more than the plaintiff's embarrassment or perception of their own reputation.[9]

---

[6] *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999).

[7] *Id.*

[8] *Id.*; *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

[9] *The Fireworks Restoration Co., L.L.C. v. Hosto*, 371 S.W.3d 83, 87 (Mo. Ct. App. 2012) (citations and internal quotation marks omitted).

Further, "[i]n a defamation claim where the plaintiff is not a public figure, the requisite degree of fault is negligence."[10]

> A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to defer third persons from associating or dealing with him. Whether a statement is capable of having a defamatory meaning is a question of law for the trial court. Words are to be taken in the sense which is the most obvious and natural according to the ideas they are calculated to convey to those to whom they are addressed.[11]

Because expressions of opinion are privileged under the First Amendment's guarantee of freedom of speech, a plaintiff alleging defamation must establish that the defendant misinformed the recipient of the statement concerning facts, rather than merely expressing opinions.[12]

> The test for an ostensible opinion is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact. Whether a statement is fact or opinion is a question of law, and we make this determination based on the totality of the circumstances surrounding a given statement. Courts should also examine the statements themselves to determine whether they are too imprecise.[13]

The Pughs point to two defamatory statements, both of which were made by Elizabeth Ennis. First, after the Pughs sued the Debtors in state court for the damage caused to the house, the following statement was posted on Craigslist on January 10, 2013, and remained there until January 21, 2013:

---

[10] *Topper v. Midwest Division, Inc.*, 306 S.W.3d 117, 127 (Mo. Ct. App. 2010) (citation omitted).

[11] *Id.* at 128 (citations and internal quotation marks omitted).

[12] *Id.*

[13] *Id.* (citations and internal quotation marks omitted). *See also Mo. Approved Jury Instr.* (*Civil*) 23.06(1), 3.06, and 4.15.

7

> BEWARE OF SLUMLORDS AND THIEFS [sic]: KENNETH AND LINDA PUGH. THEY ARE SCAMARTIST[S.] THEY S, [sic] LIARS AND THIEFS[sic]!!!! THEY RENT DUMPS TO PEOPLE THAT ARE FALLING APART AND DANGEROUS AND THEN THEY LOCK HONEST PEOPLE OUT OF THEIR HOUSES[,] STEAL ALL THEIR BELONGINGS[,] AND THEN FILE ILLEGIT LAWSUITS TO GET MONEY. THEY DON'T WORK OR ANYTHING[.] THEY SUE PEOPLE AND TRY TO GET FREE RIDES. SO BE CAREFUL. THEY LIVE IN CABOOL[,] MISSOURI. THEY PREY ON YOUNGER PEOPLE WITH GOOD JOBS. THEY ARE SUING A GOOD FRIEND OF MINE RIGHT NOW. DO NOT RENT FROM THEM!!!!! [14]

Although Elizabeth Ennis testified she did not post this statement and had nothing to do with it, the evidence was, and she essentially admitted, that this posting came from Elizabeth Ennis' e-mail account, using her cell phone. She testified she believed a friend of hers posted the statement from her phone when he "borrowed" it, but that she did not authorize the posting. Again, her testimony on this point lacked credibility. I find that Elizabeth Ennis either posted the statement herself, or directed someone else to do so, using her phone and e-mail address.

Further, I find the following statements from the posting are purported statements of fact, not opinion: that the Pughs are slumlords and thieves; that they are scam artists, liars and thieves; they rent dumps that are falling apart and dangerous; they lock honest people out of their houses, steal all their belongings and then file illegitimate lawsuits to get money; they don't work and sue people to try to get free rides; and they prey on young people with good jobs. I find, based on the evidence, that none of these statements is true, and that Elizabeth Ennis posted these false statements with the intent of harming the Pughs' reputation in the community.

---

[14] Plaintiffs' Exhibit 4.

The second instance of defamation is that, also after the Pughs sued the Debtors, Elizabeth Pugh told Christine Kossakowski, who rented the house after the Debtors vacated it, that Kenneth Pugh made sexual advances to her. She also made this statement to the attorney who was representing her in the litigation, and perhaps other people.

Specifically, Elizabeth Ennis testified at trial that, in January or February of 2012, Kenneth Pugh came to the house, ostensibly to fix something. She testified it was winter, and that it was dark at the time of the visit. She further testified that he had driven a green car or van to the property. Although her testimony was vague on many of the other details, she said he refused to leave and, ultimately, propositioned her (and her sister, who was not present) for sex. She testified that she did not make a police report or tell anyone, including her husband, about the event at the time it purportedly occurred. She only first reported it to people after the Pughs sued them. Christine Kossakowski testified that Elizabeth Ennis told her about the alleged sexual advance during a conversation in which Elizabeth Ennis was trying to convince Ms. Kossakowski to move out of the house.

Again, I found Elizabeth Ennis' testimony about these events to be entirely lacking in credibility. They are statements of fact, not opinions, and I find her statements concerning the purported sexual advance were false. Among other things, the evidence at trial was that Kenneth Pugh was legally blind at the time of the alleged event and rarely drives – and never drives at night. Further, the consistent, and credible, testimony of the Pughs, Ms. Kossakowski, and Ms. Delp was that Kenneth Pugh never went to his rental properties without his wife accompanying him.

I find, based on the evidence, that Elizabeth Ennis was responsible for both the Craigslist statement and the sexual allegation, that both statements were false,

9

and that she made them with the intent of harming the Pughs' reputations and to lower them in the estimation of the community. Such statements were also made with the intent of dissuading people from associating or dealing with the Pughs. Further, as discussed more fully below, the defamatory statements had the intended effect and, therefore, caused the Pughs significant damage.

As it relates to § 523(a)(6), I further find that the Pughs have proven, by a preponderance of the evidence that Elizabeth Ennis made the statements willfully, and that the statements were targeted at the Pughs in the sense that the conduct was certain or almost certain to cause harm to the Pughs. As a result, any damages caused by the defamatory statements are nondischargeable as to Elizabeth Ennis under § 523(a)(6).

As to damages, Willow Springs and Cabool, Missouri, where the Pughs' rental properties are located, are small towns. The uncontroverted evidence was that, prior to the statements, the Pughs' rental properties were consistently occupied by renters. By all accounts, Willow Springs and Cabool are a "landlord's market." However, being small towns, everyone knows everyone's business there and, after the statements were made, the Pughs have not been able to rent their three properties in Willow Springs and Cabool, except for the few months to Ms. Kossakowski who moved into the Willow Springs property after the Debtors left. This is despite the fact that the Pughs have now hired a real estate agent to help them find tenants. According to Linda Pugh, ever since the defamatory statements were made, potential tenants back out upon learning the Pughs' last name.

The uncontroverted evidence at trial was that the Pughs have lost a total of $22,575 in rents on three rental properties in Willow Springs and Cabool, Missouri, as a result of Elizabeth Ennis' defamatory statements.[15] I find that the

---

[15] Plaintiffs' Exhibit 15.

Pughs are, therefore, entitled to damages in the amount of $22,575 in lost rents and that such judgment is nondischargeable as to Elizabeth Ennis under § 523(a)(6).

In addition, Sharol McGehee, a psychologist who began treating the Pughs after the defamatory statements were made and continues to treat them now, testified extensively to the psychological and emotional damage the statements have caused, particularly to Kenneth Pugh.[16] Mr. Pugh is a well-respected inventor and businessman known nationally and internationally for his patents, one of which is a "Smart Gun" which will not fire unless it is in the hands of the owner. She testified that Mr. Pugh previously suffered from Post-Traumatic Stress Disorder due to his military service in Vietnam, and the stress and embarrassment caused by Elizabeth Ennis' statements has triggered severe anxiety and depression related to the previously-dormant PTSD. His reaction has also adversely affected his relationship with his wife, Linda Pugh. Dr. McGehee also testified that the Pughs will continue to need psychological care well into the future as a result of these events. In sum, Dr. McGehee's testimony and report were exceptionally credible and offered substantial evidence of significant psychological and associated physical harm to the Pughs caused by Elizabeth Ennis' defamatory statements. However, she testified that the cost of her care is covered by Medicare and supplemental insurance. Because there was no evidence of actual monetary damages related to the psychological treatment, none will be awarded.

The Pughs also seek attorneys' fees and punitive damages. On the question of attorney fees, "Missouri courts have consistently followed the 'American Rule' that, with certain exceptions, litigants bear the expense of their own attorney fees."[17] "The recognized exceptions to the rule fall into four categories: (1)

---

[16] *See also* Plaintiffs' Exhibit 11.

[17] *Birdsong v. Bydalek*, 953 S.W.2d 103, 117 (Mo. Ct. App. 1997) (citation omitted).

11

contractual agreement to pay the fees; (2) statutory provision allowing recovery of the fees; (3) recovery as damages to a wronged party involved in collateral litigation; and, (4) reimbursement ordered by a court of equity to balance benefits."[18]

The Lease at issue here provided that, "[i]n the event of default of this lease, Lessee agrees to pay all expenses including Lessor's attorney's fees necessary to rectify this matter plus $1,000."[19] The uncontroverted evidence was that the Pughs incurred $8,565 in attorney fees to the Hall Law Firm in the state court litigation to enforce the lease,[20] and that will be awarded here. However, they are not entitled to judgment for the additional liquidated damage amount of $1,000 provided under the lease because those are duplicative of the actual damages.

As to the attorney fees incurred by bankruptcy counsel after the Debtors filed their bankruptcy case, I find that those were not provided for in the lease, nor did the Pughs cite any statute authorizing such attorney fees. Nor were the Pughs damaged in "collateral litigation." As to the fourth exception to the American Rule, the "equitable balance" rule:

> Attorney's fees are awarded to equitably balance benefits only if the party seeking the fees has demonstrated "very unusual circumstances" justifying an award of fees. "Very unusual circumstances" has been construed to mean an unusual type of case, or unusually complicated litigation. The party seeking attorney's fees must show the legal actions taken by the parties significantly differ from other actions taken by other parties in similar situations, or by others trying to achieve the same result.[21]

---

[18] *Id.*

[19] Plaintiffs' Exhibit 1.

[20] Plaintiffs' Exhibit 15.

[21] *21 West, Inc. v. Meadowgreen Trails, Inc.*, 913 S.W.2d 858, 881 (Mo. Ct. App. 1995) (citations omitted) (Missouri courts are "extremely reluctant to deviate from the 'American Rule'. . . .").

This is not an unusual type of case, nor was the litigation unusually complicated. Nor did the Debtors' legal actions differ significantly from other dischargeability actions. In sum, I find that the Pughs are entitled to attorney fees in the amount of $8,565.

Finally, as to the request for punitive damages, "[i]mposing punitive damages requires that a proper balance be struck. The award must be enough to ensure that the tortfeasor is adequately punished and deterred from future similar conduct; yet the award must not be grossly excessive."[22] In determining whether to assess punitive damages, courts consider: (1) the reprehensibility of the defendant's conduct; (2) disparity between the actual harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases.[23] "In making that determination, the most important consideration is the degree of reprehensibility."[24]

> Assessing reprehensibility requires consideration of whether: (1) the harm was physical as opposed to economic; (2) the conduct evinced indifference to health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.[25]

---

[22] *The Fireworks Restoration Co., L.L.C. v. Hosto*, 371 S.W. 3d 83, 91 (Mo. Ct. App. 2012).

[23] *Id.* at 92.

[24] *Id.*

[25] *Id.* (citations and internal quotation marks omitted).

Here, the defamatory statements no doubt caused the Pughs both physical and economic damages. Further, Elizabeth Ennis was indifferent to the Pughs' well-being and published the statements with intentional malice toward them. However, there was no evidence to suggest that the Pughs are financially vulnerable and the statements were, in essence, two or three isolated incidents.

While I find Dr. McGehee's testimony about the psychological and physical harm to Mr. Pugh to be compelling, and that the statements were reprehensible to a certain degree, I find that the actual damages awarded in this case – particularly since they are nondischargeable – are sufficient to punish Elizabeth Ennis for making the statements she made and to deter her from making any similar statements in the future. The request for punitive damages will, therefore, be denied.

ACCORDINGLY, by separate Order, the Clerk of the Court will be directed to enter Judgment in favor of Plaintiffs Kenneth and Linda Pugh, and against Debtor-Defendants Robert Ennis and Elizabeth Ennis, jointly and severally, in the amount of $4,500, with such Judgment being nondischargeable under 11 U.S.C. § 523(a)(2)(A); and in favor of Plaintiffs Kenneth and Linda Pugh, and against Debtor-Defendant Elizabeth Ennis only in the amount of $31,140, with such Judgment being nondischargeable under 11 U.S.C. § 523(a)(6).

/s/ Arthur B. Federman
Dated: 6/17/2014              Chief Bankruptcy Judge